Hinkle, J.
In this case, defendant John Geoghan has been indicted on two charges of rape of a child in violation of G.L.c. 265, §23. Both indictments allege that the defendant committed unnatural sexual intercourse and abuse on Anthony Donovan. The Commonwealth’s theory of prosecution is that the defendant engaged in oral sex with the complainant.[1]
Now before the Court is the defendant’s motion to dismiss the indictments on the ground that they are time-barred by the applicable statute of limitations.[2] The defendant argues that the indictments were untimely as of May 22, 1996. After an evidentiary hearing conducted on February 27 and March 1, 2002, which included testimony from nine witnesses and introduction of five exhibits, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
1. The Grand Jury indicted defendant on these crimes on December 2, 1999. The indictments allege that the rapes occurred “between December 16, 1980 and December 16, 1984.”[3]
2. Anthony Donovan (“Donovan”), the alleged victim, was born on December 16, 1974. His mother is Barbara Boyd (“Boyd”).
3. During the period encompassed by the indictments, Boyd and her son were acquainted with the defendant through Boyd’s companion, John Stevens.
4. During their acquaintance, the defendant, with Boyd’s permission, took Donovan on outings which included trips for ice cream and swimming. Boyd also gave the defendant permission on one occasion to take her son to the defendant’s mother’s house.
5. At times defendant visited Donovan’s home around the time Donovan went to bed, and he then spent time with Donovan in his bedroom with the lights out.
6. At some time before November 1984, Boyd questioned the defendant about his repeated arrival at their *332 home at her son’s bedtime. After Boyd raised the issue, the defendant stopped seeing Donovan.
7. In November 1984, when Donovan was nine years old, he began counseling at West-Ros Park Mental Health Center with Judith Israel (“Israel”), a psychiatric nurse and psychologist. The primary reason for the therapy was that Donovan had sexually fondled his younger brother and had placed his mouth on his brother’s penis. Donovan had other behavioral problems which were also addressed in therapy.
8. At the time Boyd sought counseling for her son, Boyd told Israel that she suspected that her son had been sexually abused by the defendant. Boyd was also in therapy with Israel at this time.
9. On a date shortly before February 7, 1986, Boyd questioned her son about problems he was experiencing, including depression and suicidal tendencies. In response to his mother’s questions, Donovan told his mother that the defendant had “touched him between the legs.” Boyd is unable to recall the exact words that her son used or the details he reported to her. Donovan was 11 years old at this time.
10. On February 7, 1986, Boyd told Israel about her son’s accusations. At his next regular therapy session on February 10, 1986, Donovan acknowledged to Israel that he had told his mother about having been sexually abused by the defendant, but Donovan did not provide details to Israel about the nature of the abuse.
11. On February 12, 1986, Boyd and Israel together phoned the Department of Social Services (“DSS”) hotline to report Donovan’s allegations of sexual abuse by the defendant. Boyd told DSS that her son had told her that the defendant had touched him “more than once” between the legs; that the first time he did so, defendant told Donovan that he was showing him how body parts worked; that Donovan had refused the defendant’s overtures on occasion, but defendant told Donovan tobe quiet and continued his abuse; and that the defendant had asked Donovan to touch him, but Donovan had refused. Later that same day, Israel sent a written report to DSS memorializing the disclosure. Israel stated in her report: “Anthony Donovan was sexually fondled by Father Gaghan (sic) over an extended period of time. This took place when Father would visit Anthony after Anthony was in bed at night. Anthony reported this to his mother who in turn called me. Anthony acknowledges this happening but won’t talk to me about it. . .”
12. DSS screened in Israel’s written report and assigned the matter to social worker Thomas Caggiano (“Caggiano”) for investigation. On or about February 18, 1986, Caggiano interviewed Donovan and Boyd at their home. According to Caggiano, Donovan reported to him that the defendant had touched him repeatedly between the legs, including the area of his penis. Donovan does not today recall his interview with Caggiano.
13. During his investigation of Donovan’s allegations, Caggiano interviewed the defendant, who denied touching Donovan sexually but acknowledged being naked with Donovan in the shower and soaping him down and acknowledged taking Donovan swimming 6-12 times over a 2-3 year period.
14. On February 19, 1986, Caggiano substantiated the report of sexual abuse by defendant and stated in writing his reasons for doing so:
(1) The 11-year-old child told worker that Father John Gaughan (sic) touched him on the penis between 10 and 20 times. The incidents reportedly occurred when Father Gaughan and the child were in the shower and in the child’s bedroom.
Mother reported that the child exhibited inappropriate sexual behavior by engaging in oral sex with his younger brother. She also reported that the child was depressed and withdrawn during the past few months. These behaviors indicate the possibility of the child having been sexually abused.
The child’s therapist, Judy Israel, stated that she believes some type of sexual abuse did occur because of the child’s sexual behavior . . .
15. On February 21, 1986, Caggiano initiated a referral to the District Attorney’s Office. He sent the referral form to the Boston/Brighton regional DSS office on February 25, 1986. Caggiano stated in the referral form: “The child reported that his penis was touched by Father John Gaughan (sic) while in the shower together and while in the child’s bedroom. The child reported Father Gaughan did this 10-20 times.” Caggiano did not check the portion of the form indicating an allegation of rape. The investigation form and the DSS reports under §§51A and 5 IB of G.L.c. 119 were then reviewed and mailed by Donna Makin, the Regional Director of DSS, to the District Attorney’s office. There, Michele Petruzelli, a victim witness advocate, reviewed the DSS referral and created a case file on March 4, 1986.
16. This file, numbered 688D, formally began an investigation by the District Attorney of Donovan’s allegations of sexual abuse by the defendant. Unfortunately, although the file jacket exists today, its contents are missing, and the Assistant District Attorney who handled the investigation in 1986, Louis M. Nordlinger, is now deceased.
17. The DSS report to the District Attorney’s office is the first “report” to law enforcement of the defendant’s sexual abuse of Donovan. March 4, 1986, the date of its receipt in the District Attorney’s office, is the day the limitations period begins to run in this case.
18. At an uncertain date in the spring of 1986, but during weather she now recalls as “warm,” Boyd accompanied her two sons and Stevens to the police station in Brighton to report the defendant’s abuse of *333 Donovan. Boyd does not now recall the details of what she reported.
19. Donovan recalls that when he told his mother in February 1986 that he had been sexually abused, he told her “everything, ” including that the defendant had performed oral sex upon him. He also recalls that he provided this information to the District Attorney’s Office around the same time.
20. In 1986, Boston Police Department Superintendent Margaret O’Malley[4] and Lieutenant Detective Edward Simmons interviewed Donovan at his home about the defendant’s alleged abuse. Unfortunately, no contemporaneous report of their interview exists.
21. Neither Superintendent O’Malley nor Detective Simmons remembers the specific acts that Donovan described to them in 1986, although Superintendent O’Malley’s present recollection is that Donovan only mentioned being touched on the buttocks by the defendant.
22. Superintendent O’Malley had a telephone interview with the defendant in 1986. The defendant admitted tucking Donovan in at bedtime but denied any improper touching. The police department records of this interview are missing.
23. After conducting its 1986 investigation, the District Attorney’s office decided against prosecuting the defendant based upon Boyd’s belief that her son was not emotionally able to testify. Around this time, the District Attorney’s office sent a “no prosecution” letter to Boyd. The decision not to prosecute was not based on any analysis of the nature of the crimes alleged.
24. On the basis of the credible evidence before me, the Commonwealth has not proven beyond a reasonable doubt that in 1986 Anthony Donovan did not report that defendant had oral sex with him to the police and/or the District Attorney’s office.
25. In 1989, another complainant alleged sexual abuse by the defendant. On the basis of the 1986 reports, a representative of the office of the District Attorney again contacted Donovan and Boyd. At that time, the District Attorney’s office had received no new information about the Donovan matter, and the defendant had no contact with Donovan since before the 1986 investigation. Superintendent O’Malley was involved in the renewed investigation because she had handled the 1986 investigation.
26. In 1989, during an interview with Assistant District Attorney Robert E. Baylor, Baylor asked Donovan to describe his relationship with the defendant during the period which was the subject of the 1986 investigation. Donovan, among other things, responded by telling ADA Baylor that the defendant had had oral sex with him.
27. In 1989, the District Attorney’s office again declined prosecution of the defendant because Donovan was not emotionally able to go forward.
28. When the District Attorney decided to prosecute the defendant in 1999, the decision was based primarily on Donovan’s willingness to testify and not on new or different evidence or information.
29. Beginning on April 3, 1989, defendant spent 10 days as an inpatient at St. Luke’s Institute in Suitland, Maryland. In 1995, defendant spent another 10 days at the same facility. From August 10 to November 4, 1989, a period of 87 days, defendant was an inpatient at the Institute of Living in Hartford, Connecticut.
RULINGS OF LAW
The defendant moves to dismiss the indictments which the Grand Jury returned on December 2, 1999 on the ground that they are time barred by the applicable statute of limitations which provides in relevant part:
An indictment for the crime [of child rape] . . . may be found and filed within ten years of the date of commission of said crime or crimes . . . but any period during which the defendant is not usually and publicly a resident within the commonwealth shall be excluded in determining the time limited.
Notwithstanding the foregoing provisions, if a victim of a crime [of child rape]... is under the age of sixteen at the time such crime is committed, the period of limitation for prosecution shall not commence until the victim has reached the age of sixteen or the violation is reported to a law enforcement agency, whichever occurs earlier.
G.L.c. 277, §63 (1995) (emphasis added).
The defendant contends that the 107 days he spent as an inpatient in facilities outside Massachusetts have no effect on the running of the limitations period. The defendant also argues that the 10-year limitations period began in February of 1986 when DSS was notified of the defendant’s misconduct, or at the latest in March of 1986, when the District Attorney was notified by DSS of its substantiation of the referral by Boyd and Israel. The defendant also argues that information that the defendant had engaged in repeated sexual activity with Donovan constitutes a “report” of a “violation” under G.L.c. 277, §63 which began the running of the limitations period with respect to the crime of child rape.
The Commonwealth contends, on the other hand, that the limitations period was tolled for 107 days when the defendant was an inpatient in facilities outside Massachusetts and thus not “usually and publicly a resident of the Commonwealth.” The Commonwealth also argues that the 10-year limitations period did not begin to run until 1989, when Donovan told Assistant District Attorney Baylor that the defendant had performed oral sex on him. The Commonwealth argues that the 1986 disclosure does not constitute a “report” of the “violation” of rape under G.L.c. 277, §63 because it does not involve an allegation of penetration, a necessary element of the crime. *334 The Commonwealth therefore claims that the present indictments are timely because effective May 23, 1996 §63 was amended to extend the limitations period to 15 years.
Once the statute of limitations issue is raised by a defendant in a criminal case, the Commonwealth bears the burden of demonstrating beyond a reasonable doubt that the indictments are timely. Commonwealth v. Cogswell, 31 Mass.App.Ct. 691, 694-95 (1991), rev. den., 411 Mass. 1106 (1992); U.S. v. Owens, 965 F.Sup. 158, 163 (D.Mass. 1997). “The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.” Toussie v. United States, 397 U.S. 112, 114-15 (1970). For these reasons, criminal statutes of limitations are to be strictly construed against the Commonwealth and liberally interpreted in favor of repose. Id. at 115; Commonwealth v. McLaughlin, 431 Mass. 241, 250 (2000); Commonwealth v. Valchuis, 40 Mass.App.Ct. 556, 558 (1996).
Here, the legislature extended the applicable limitations period between the date of the alleged crimes, 1980 to 1984, and the 1999 indictments. Before 1985, the limitations .statute for all sexual offenses was six years from the date the crime was committed, except that any period during which the defendant was not “usually and publicly a resident within the commonwealth” was to be excluded in determining the time. See Commonwealth v. George, 430 Mass. 276, 279 (1999).
Effective September 30, 1985, the statute of limitations was amended to provide in relevant part that “an indictment for the crime [of child rape] may be found and filed within ten years of the date of commission of said crime or crimes.” St. 1985, c. 123. This amendment applies to offenses which were not time-barred under the earlier version of the statute on the date the amendment took effect. Commonwealth v. Bargeron, 402 Mass. 589, 592-94 (1988); Commonwealth v. Martin, 47 Mass.App.Ct. 240, 242 (1999). Because the defendant allegedly committed the rapes of Donovan in December of 1980 at the earliest, the indictments were not time-barred on September 30, 1985 and are therefore subject to the 10-year limitations period.
Thereafter, effective February 8, 1988, the statute of limitations was further amended in relevant part:
Notwithstanding the foregoing provisions, if a victim of the crime [of child rape] ... is under the age of sixteen at the time such crime is committed, the period of limitation for prosecution shall not commence until the victim has reached the age of sixteen or the violation is reported to a law enforcement agency, whichever occurs earlier.
St. 1987, §490. Again, this amendment applies to offenses which were not time-barred under the earlier version of the statute as of the date of the amendment. Commonwealth v. Bargeron, 402 Mass. at 592-94; Commonwealth v. Martin, 47 Mass.App.Ct. at 242.
Because the defendant’s offenses were not time-barred on February 8, 1988 under the 10-year statute of limitations, they are subject to the 1988 amendment.
In applying this limitations statute to the present indictments, this Court must resolve two questions: (i) whether the statute of limitations was tolled during the relevant period, and (ii) when the alleged “violation” was “reported” to a law enforcement agency within the meaning of G.L.c. 277, §63. Both issues involve matters of apparent first impression.
For purposes of the statute of limitations, “any period during which the defendant is not usually and publicly a resident within the commonwealth shall be excluded in determining the time limited.” G.L.c. 277, §63 (2000). This tolling provision serves the state’s interest in investigating and prosecuting crime and in “assuring that the defendant is available locally not only to enhance the possibility of detection but also to avoid the burdens of extradition proceedings, should he be charged, his whereabouts become known, and he refuses to return voluntarily.” Commonwealth v. George, 430 Mass. at 283. The tolling provision applies whether a defendant’s absence from the state is voluntary or involuntary, and whether or not the defendant intends to change his legal residence. Couture v. Commonwealth, 338 Mass. 31, 34 (1958). In addition, the tolling provision applies whether or not the defendant’s absence from the Commonwealth is intended to avoid prosecution. Commonwealth v. George, 430 Mass. at 284.
The Commonwealth contends that the defendant was not “usually and publicly a resident within the commonwealth” during the three periods in which he was an inpatient in facilities in Maryland and Connecticut. The Commonwealth thus seeks to exclude 107 days from the running of the statute of limitations.
The Supreme Judicial Court has held that G.L.c. 277, §63 is tolled by a defendant’s incarceration in another state. Couture v. Commonwealth, 338 Mass. at 34. The statute is also tolled where the defendant moves out of state following commission of a crime. Commonwealth v. George, 430 Mass. at 279-80. Aside from these two situations, the scope of the tolling provision has not been delineated by Massachusetts appellate courts.
The Commonwealth relies on the general statement in Couture that “the period of limitation is tolled during *335 any period a person accused of crime is absent from the Commonwealth.” 338 Mass. at 34. However, the Supreme Judicial Court made this statement in the context of rejecting the argument that the statute is tolled only by periods of voluntary absence from the state, and it does not support the proposition that any absence from the state, no matter how brief, must be excluded from the calculation. Nor does the language of the statute. The broad interpretation the Commonwealth urges in this case is contrary to the principle that criminal statutes of limitations are to be strictly construed against the Commonwealth and liberally interpreted in favor of repose. Commonwealth v. McLaughlin, 431 Mass. at 250; Commonwealth v. Valchuis, 40 Mass.App.Ct. at 558.
Neither party has brought to my attention any legislative history which clarifies the meaning of the statutory phrase “usually and publicly a resident.” In construing a statute, the duty of the court is to ascertain and implement the intent of the legislature. Pielech v. Massassoit Greyhound, Inc., 423 Mass. 534, 539 (1996), cert. denied, 520 U.S. 1131 (1997). The intent of the legislature is to be ascertained from all its words using the ordinary and approved usage, examined in light of the statute’s purpose. Commonwealth v. Smith, 431 Mass. 417, 421 (2000); Crenshaw v. Macklin, 430 Mass. 633, 634 (2000); Peters v. United National Ins. Co., 53 Mass.App.Ct. 775, 780 (2002). Where the legislature has not defined a term, the court construes the term as it is commonly understood, according to its plain and ordinary meaning. Nile v. Nile, 432 Mass. 390, 394 (2000); Commonwealth v. One 1987 Mercury Cougar Automobile, 413 Mass. 534, 537 (1992). The court derives such meaning from sources presumably known to the statute’s enactors, such as dictionary definitions and accepted meanings in other legal contexts. Commonwealth v. One 1987 Mercury Cougar Automobile, 413 Mass. at 537-38; Commonwealth v. O’Keefe, 48 Mass.App.Ct. 566, 567 (2000).
If the legislature had intended to toll the statute of limitations for any absence of a defendant from the Commonwealth, it would presumably have said so. Instead, the language of the statute permits exclusion of time when a defendant is not “usually and publicly a resident.” The legislature must have intended the modifier “usually and publicly” as a term of limitation. “Usually” means “according to what is usual or customary; generally; commonly; ordinarily,” and “publicly” means “in a public manner; with exposure to popular view or notice; without concealment.” Webster’s New Universal Unabridged Dictionary (2d ed. 1979). Applying the ordinary meaning of those terms, I find and rule that the Commonwealth has not carried its burden of proving that during the defendant’s absence for the 107-day period or any portion thereof, he was not “usually and publicly a resident of the commonwealth.”
My conclusion is buttressed by the fact that in interpreting identical tolling provisions, other jurisdictions have concluded that temporary absences from the state, such as for business or pleasure, are not periods when the defendant is “not usually and publicly resident” and do not toll the statute of limitations. See People v. Edwards, 436 N.E.2d 727, 730 (Ill.App. 1982); State v. Williams, 31 A.2d 369, 370 (N.H. 1943); People v. Guariglia, 65 N.Y.S.2d 96, 100 (N.Y. 1946). The record before this Court is devoid of any facts bearing on whether the defendant was “usually and publicly resident” in Massachusetts during the periods at issue. It is unclear from the evidence whether during his inpatient stays out of state, the defendant continued to use a place of inhabitance within Massachusetts in an open manner such that he would customarily be expected to be found there. See People v. Edwards, 436 N.E.2d at 730. It is also unclear whether the defendant remained a priest of the archdiocese during his inpatient stays and whether he remained assigned to a Massachusetts parish. The only evidence before the Court on this issue is a stipulation regarding the duration of the defendant’s inpatient stays outside the Commonwealth and a reference in Exhibit 2 that the defendant’s residence was in Scituate on June 12, 1989 and that his parish was Saint Julia’s in Weston around the same time. On this evidence, the Commonwealth has simply not met its burden of proving beyond a reasonable doubt that the defendant’s inpatient stays in Maryland and Connecticut, for 10 days in April 1989 and January 1995 and 87 days in the fall of 1989, tolled the running of the statute of limitations under G.L.c. 277, §63.
The next issue to address is whether the indictments charging child rape were filed within 10 years of the date when the “violation” was “reported” to a law enforcement agency[5] within the meaning of G.L.c. 277, §63. If, as the Commonwealth contends, the first report of the violation occurred in 1989 when Donovan informed Assistant District Attorney Baylor that the defendant had engaged in oral sex with him, then the period for indictment was still alive in 1996 when G.L.c. 277, §63 was amended to provide: “An indictment for [the crime of child rape] . . . may be found and filed within fifteen years of the date of commission of such offense.” St. 1996, c. 26. The Grand Jury’s return of the present indictments for rape of a child on December 2, 1999 would therefore be timely.
After careful review of the evidence, particularly Donovan’s testimony that in 1986 he told his mother and the District Attorney “everything,” including that the defendant had performed oral sex on him, I find and rule that the Commonwealth has not carried its heavy burden of proving beyond a reasonable doubt that the first report to law enforcement officials of oral sex occurred in 1989. Here there is stark conflict in the testimony between Donovan and the other witnesses regarding the nature of the disclosure of *336 defendant’s misconduct; the District Attorney’s 1986 case file and 1986 Boston Police Department records are missing, the Assistant District Attorney who handled the 1986 investigation has died, and the 1989 prosecutor understandably does not remember the contents of the 1986 case file. This situation illustrates the under lying purpose of the statute of limitations: to protect individuals from having to defend themselves against charges when the basic facts are obscured by the passage of time. See Toussie v. United States, 397 U.S. at 114-15.
In addition, whether or not Donovan specifically described oral sex with the defendant to the District Attorney in 1986, his report of multiple sexual acts by the defendant in different locations, including touching between the legs and touching of his penis between 10 and 20 times, constitutes, in my view, a “report” of a “violation” sufficient to trigger the running of the statute of limitations with respect to the crime of child rape. Although many jurisdictions have similar statutes of limitation for sexual offenses against minors triggered by a “report” of the crime, the parties have not cited, nor has this Court found, any interpretative case law shedding light on this precise issue.[6]
The Commonwealth of course is correct in its argument that genital fondling constitutes indecent assault and battery in violation of G.L.c. 265, §13B, a separate crime from oral sex constituting rape in violation of G.L.c. 265, §23. However, in construing the statute before me I must be guided by the principle that criminal statutes of limitations are to be strictly construed against the Commonwealth and liberally interpreted in favor of repose. Commonwealth v. McLaughlin, 431 Mass. at 250; Commonwealth v. Valchuis, 40 Mass.App.Ct. at 558. If I discredit Donovan’s testimony that he disclosed oral sex with the defendant in 1986, the question then is whether under the specific and perhaps unique facts of this case, the March 1986 report from DSS to the District Attorney gave law enforcement authorities constructive knowledge that the defendant had performed oral sex on Donovan, commencing the statute of limitations for the crime of rape.
Here there is no dispute that law enforcement authorities knew in 1986 that Donovan claimed that the defendant had touched his penis numerous times and in several locations and knew that Donovan had placed his mouth on his younger brother’s penis. Law enforcement authorities also knew that, according to Donovan, the defendant had attempted to broaden the range of sexual activity by asking Donovan to touch him. In those jurisdictions where the statute of limitations is triggered by “discovery of the offense,” the term discovery encompasses constructive knowledge of the crime, i.e., facts sufficient to put a reasonably prudent person on inquiry that a crime has occurred, and knowledge of facts which, when investigated with reasonable diligence, would make one aware that a crime had occurred. See People v. Bell, 45 Cal.App. 4th 1030, 1061-62 (Cal.App. 4th Dist. 1996); People v. Crossman, 210 Cal.App.3d 476, 480-81 (Cal.App. 6th Dist. 1989); People v. Kronemyer, 189 Cal.App.3d 314, 330 (Cal.App. 4th Dist. 1987) (interpreting Cal. Penal Code §803(c) (loislaw 2001)). See also Commonwealth v. McSloy, 751 A.2d 666, 669 (Pa. Super.), rev. den., 766 A.2d 1246 (Pa. 2000); Commonwealth v. Hawkins, 439 A.2d 748, 750-51 (Pa. Super. Ct. 1982) (interpreting Pa. Stat. Ann. tit. 42, §5552(c) (loislaw 2001)); People v. McGreal, 278 N.E.2d 504, 510 (Ill.App. 1st Dist. 1971) (interpreting Ill. Comp. Stat. 5/3-6 (loislaw 2001)).
The Massachusetts statute, G.L.c. 277, §63 is triggered by a “report"[7] rather than the "discovery” of a violation. As noted, in light of the missing files from the District Attorney’s office and the police department, the understandable inability of witnesses to remember the contents of the files, the death of the prosecutor handling the 1986 investigation, and Donovan’s statement that he told his mother and the District Attorney “everything,” the Commonwealth has not proven beyond a reasonable doubt that Donovan did not expressly report oral sex in 1986. In addition, whether or not Donovan’s account of the sexual abuse by the defendant included a specific allegation of oral sex, law enforcement officials in March of 1986 had sufficient information from which they reasonably should have known about Donovan’s claim that the defendant had engaged in oral sex with him.
As noted by the Supreme Court, statutes of limitations “have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.” Toussie v. United States, 397 U.S. at 115.1 find and rule that the March 1986 DSS report to the District Attorney was sufficient to trigger G.L.c. 277, §63 for purposes of the present indictments, and the statute of limitations thus expired in March of 1996, before the May 23, 1996 extension of the limitations period from 10 to 15 years. Because the Commonwealth has failed to meet its burden of demonstrating beyond a reasonable doubt that the rape indictments are timely under G.L.c. 277, §63, the indictments must be dismissed.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to dismiss indictments No. 99-11434; 001 and 002 is ALLOWED.

 In Commonwealth v. Gallant, the Supreme Judicial Court ruled that the term “unnatural sexual intercourse” as used in G.L.c. 265, §23 includes fellatio. See Commonwealth v. Gallant, 373 Mass. 577, 584 (1977).

 G.L.c. 277, §63 as amended by St. 1987, c. 489.

 The Commonwealth has moved to amend the indictments. The parties say that the amendment has no effect on the limitations question.

 Superintendent O’Malley was a Lieutenant Detective in the Boston Police Department in 1986 and the commanding officer of the sexual assault unit.

 This Court rejects the defendant’s argument that DSS is a “law enforcement agency" for purposes of G.L.c. 277, §63. Although DSS is required to refer substantiated reports of sexual abuse to the district attorney’s office, it is not a “law enforcement agency” as that term is commonly used throughout the General Laws. See, e.g., G.L.c. 22A, §1 (defining law enforcement agency as “any police department in the commonwealth or any of its political subdivisions”); G.L.c. 209A, §1 (defining law officer as “any officer authorized to serve criminal process”). See also G.L.c. 12, §32(d) (distinguishing between law enforcement agencies and DSS for purposes of juvenile justice programs).

 See Cal. Penal Code §803(f) (loislaw 2001) (one year of the date of a report to a responsible adult or agency by a child under 18 years of age); Conn. Rev. Stat. §54-193a (loislaw 2001) (within two years of the date the victim attains the age of majority or within five years from the date the victim notifies any police officer or state's attorney, whichever is earlier); Del. Code Ann. tit. 11, §205(e) (loislaw 2001) (disclosure to child protective services agency or law enforcement agency); Fla. Stat. Ann. §775.15(7) (West. 1999) (victim reaches age of 16 or violation is reported to law enforcement agency or other governmental agency, whichever occurs earlier); Ga. Code Ann. §17-3-2.1 (loislaw 2001) (victim reaches age of 16 or violation is reported to a law enforcement agency, prosecuting attorney or other governmental agency, whichever occurs earlier); N.D. Stat. §29-04-03.1 (loislaw 2001) (within seven ears after commission of offense or within three years after offense is reported to law enforcement authorities); N.M. Stat. Ann. §30-1-9.1 (West 1978) (victim attains age of 18 or violation is reported to a law enforcement agency, whichever occurs first); N.Y. Crim. Proc. §30.10(f) (loislaw 2001) (when child reaches age 18 or offense is reported to law enforcement agency or statewide central register of child abuse, whichever occurs first); Or. Rev. Stat. §131.125(2) (loislaw 2001) (if victim under age 18, anytime before victim attains age 24 or within six years after offense is reported to a law enforcement agency, whichever occurs first); Vt. Stat. Ann. tit. 13, §4501 (1995) (the earlier of the date the victim attains the age of 24 or six years from the date the offense is reported, which occurs when a report of the conduct constituting the offense is made to a law enforcement officer). Cf. Nev. Rev. Stat. Ann. § 171.095(b) (West 2002) (when victim discovers or reasonably should have discovered that he was victim of sexual abuse, but at latest, when victim is 28 years old); N.J. Stat. Ann. §2C: 1-6(4) (loislaw 2001) (within five years of victim attaining age 18 or within two years of discovery of offense by victim, whichever is later).

 To “report” means “to give an account of ... to give information about, as something seen or investigated ... to give a formal statement or account of, to announce formally, as the results of an investigation.” Webster’s New Universal Unabridged Dictionary (2d ed. 1979).